# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS—TOPEKA DIVISION

| | |
|---|---|
| MIKE THOMPSON, Member of the Kansas Senate, in his official capacity, and MICHAEL MURPHY, Member of the Kansas House of Representatives, in his official capacity, <br><br> Plaintiffs, <br><br> v. <br><br> TY MASTERSON, President of the Kansas Senate, in his official capacity, and DANIEL HAWKINS, Speaker of the Kansas House of Representatives, in his official capacity, <br><br> Defendants. | No. 5:23-cv-04120-TC-GEB |

## PLAINTIFFS' AMENDED BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

# INTRODUCTION

On March 22, 2023, a simple majority in the Kansas Senate and a simple majority in the Kansas House of Representatives voted to pass Concurrent Resolutions applying to Congress to call a convention to propose amendments to the U.S. Constitution. Those votes were sufficient under Article V of the U.S. Constitution. Those resolutions failed, however, solely because they did not reach the super-majority requirement imposed by Article 2 Section 13 of the Kansas Constitution, which requires a two-thirds vote of elected legislators in both Chambers to pass a resolution to either call a convention to propose amendments to the U.S. Constitution or ratify an amendment to the U.S. Constitution. That provision of Kansas law is unconstitutional because Article V of the U.S. Constitution sets forth exclusive procedures for Congress and state legislatures to amend the federal Constitution. When state legislatures act pursuant to their authority under Article V, they exercise a federal function from federal law. States cannot, whether through their constitutions or state law, impose limitations or additional procedural requirements on state legislatures acting pursuant to this federal authority. Even the Kansas Attorney General has said so. **Exhibit A**. Plaintiffs respectfully request judgment on the pleadings and a declaratory judgment that the process of applying for a convention to propose amendments is a federal function derived from the federal Constitution, and that the Kansas Constitution's imposition of a super-majority requirement upon the Kansas Legislature for making such application is invalid.

There are no jurisdictional impediments to the Court's enforcement of the U.S. Constitution's plain command. Plaintiffs Senator Mike Thompon and Representative Michael Murphy both have standing to bring their request for declaratory and injunctive relief. They have suffered a personal, individualized injury, akin to the injury suffered in *Coleman v. Miller*, 307 U.S. 433 (1939). There are also no political questions, and this case is justiciable. Courts can, and

often do, determine whether the action or procedure behind a legislative enactment was constitutional and whether a provision of a state constitution is, in fact, constitutional. And in numerous cases, the federal courts have specifically reached the merits on whether a state constitution can control the federal amendment process under Article V of the U.S. Constitution. *See infra* at 7-9. There is no "textually demonstrable constitutional commitment of the issue[s] to a coordinate political department" nor "a lack of judicially discoverable and manageable standards for resolving [these issues]." *Baker v. Carr*, 369 U.S. 186, 217 (1962). Finally, this case is not moot because it is "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911). The short time period of legislative sessions and the near certainty of future calls for Article V conventions in the Kansas Legislature compel a decision today. Every time the Kansas Legislature acts pursuant to this unconstitutional super-majority provision of Kansas law, it violates the U.S. Constitution's explicit commands and deprives Kansas citizens of the opportunity to call a constitutional convention to propose amendments to the U.S. Constitution or ratify an amendment to the U.S. Constitution. The Court should finally put an end to this practice and strike down this provision of Kansas law.

## FACTUAL BACKGROUND

Under Article V of the U.S. Constitution, Congress must call a constitutional convention once 34 state legislatures adopt resolutions applying for conventions. On March 22, 2023, majorities of the House of Representatives and Senate of the Kansas Legislature each voted on substantively identical resolutions applying for a convention of the States to consider amendments. **Doc. 1, at 2, ¶ 1**. House Concurrent Resolution 5008 received 74 affirmative votes and 48 negative votes. *Id*. **at 4, ¶¶ 16-17**. Senate Concurrent Resolution 1607 received 22 affirmative votes and 16 negative votes. *Id*. **at 4, ¶¶ 21-22**. The Speaker of the House and the

President of the Senate (or "Defendants") each ruled that their respective measures did not pass, even though they gained clear majorities, *solely* because each believed that Article 2 Section 13 of the Kansas Constitution required a two-thirds majority vote for passage.[1] As Defendants admitted:

> Defendant Masterson, President of the Senate, and Defendant Hawkins, Speaker of the House, ruled that SCR 1607 and HCR 5008 did not pass in their respective Chambers *solely* because they believed these resolutions failed to satisfy Article 2 Section 13 of the Kansas Constitution . . . .

**Doc. 1, at 5, ¶ 28** (Complaint) (emphasis added); **Doc. 6, at 3, ¶ 28** (Answer). The Defendants were not merely following the rules of their respective houses in making their rulings.

There are no disputed facts. This case presents a straightforward question of federal constitutional law: Can the Kansas Constitution be used to impose a super-majority requirement on the Kansas Legislature when it considers whether to petition for a federal Article V convention?

This case was filed on January 24, 2024. **Doc. 1**. The Plaintiffs had originally hoped to obtain a ruling prior to the expiration of the 2024 legislative session. A ruling that either House had passed the measure would have resulted in the opportunity to transmit either of the two measures to the other House for final passage. Kan. Const. art. II, § 8 ("Bills and concurrent resolutions under consideration by the legislature upon adjournment of a regular session held in an odd-numbered year may be considered at the next succeeding regular session held in an even-numbered year, as if there had been no such adjournment."). Since the 2024 session has ended, the ruling Plaintiffs seek applies to the legality of future votes. This will clear the way for a new vote

---

[1] Article 2 Section 13 of the Kansas Constitution provides: "Majority for passage of bills. A majority of the members then elected (or appointed) and qualified of each house, voting in the affirmative, shall be necessary to pass any bill. Two-thirds (2/3) of the members then elected (or appointed) and qualified in each house, voting in the affirmative, shall be necessary to ratify any amendment to the Constitution of the United States or to make any application for congress to call a convention for proposing amendments to the Constitution of the United States."

to be taken in each House, free from the purported limitation of the Kansas Constitution. This is a classic example of a controversy that is capable of repetition yet evading review.

## ARGUMENT

### I. The Plaintiffs Have Standing.

To begin, the Court has jurisdiction over the present lawsuit. Both Plaintiffs voted in favor of their respective Chamber's version of the Concurrent Resolution applying to Congress to call a convention of the States for the purposes indicated. **Doc. 1, at 3, ¶¶ 12-13**. Their votes were in the majority but were denied the effect of passing the measure solely because the Defendants enforced the unconstitutional dictates of the Kansas Constitution. **Doc. 1, at 5, ¶ 28**; **Doc. 6, at 3, ¶ 28**. Plaintiffs therefore have suffered personal injury that confers standing to pursue this litigation.

#### a. Supreme Court precedent establishes that Plaintiff have standing.

Two Supreme Court cases clearly establish Plaintiffs' standing. The first is *Raines v. Byrd*, 521 U.S. 811 (1997). It involved a constitutional challenge to the Line Item Veto Act brought by six individual members of Congress who all voted in opposition to the Act and lost after a majority voted in favor. *Id*. at 814. They claimed the Line Item Veto Act would erode the efficacy of their future votes on legislation involving funding. *Id*. at 816. But they did not claim that their votes were counted incorrectly or that they had sufficient votes to defeat passage of the bill. *Id*. at 824.

The Court began its standing analysis by noting that legislators have standing when they "allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id*. at 818 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The Court made it plain that legislative standing would obtain when it found that legislators "*voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless*

*deemed defeated.*" *Id.* at 824 (emphasis added). In other words, legislators who vote for a measure that had sufficient votes to pass have standing to challenge a ruling that the measure failed. *Id*.

That describes the present situation. Plaintiffs voted for specific resolutions with sufficient votes to pass, but Defendants nonetheless deemed the resolutions defeated due to the Kansas constitutional provision Plaintiffs challenge. *Raines* establishes Plaintiffs' standing.

Second, *Coleman v. Miller*, 307 U.S. 433 (1939), confirms Plaintiffs' standing. It arose out of the Kansas Legislature's vote on ratification of the Child Labor Amendment. *Id*. at 435. The House voted in favor of ratification by a simple majority. *Id*. at 436. The Senate split 20-20, but ratification was deemed to have passed because the Lieutenant Governor broke the tie by voting in favor of the measure. *Id*. Dissenting legislators in the Kansas Senate and House of Representatives brought the lawsuit, claiming it was unconstitutional for the Lieutenant Governor to cast the tie-breaking vote. *Id*. The Supreme Court held that these dissenting legislators had standing to sue. *Id*. at 437. The Senators claimed their "votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification." *Id.* at 438. The Court agreed: "They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege." *Id.*

The claims in *Coleman* and in this case are parallel. Both cases involve the constitutionally correct method of counting the votes. Those claiming to be in the majority have standing to challenge the constitutionality of the chamber leader's ruling that rendered their vote ineffective.

The Supreme Court has never conditioned legislative standing on a suit being filed by a majority of legislators. Legislators' lack of standing in *Raines* was not based on their number but on the institutional nature of their claimed interest. *Id*. at 829. The Court noted that even a single

5

legislator would have standing when he or she voted in the majority but was still deemed to have lost, notwithstanding the number of plaintiffs-legislators. *Id*. at 824; *id*. at 820-21 (noting a single legislator had standing to challenge a legal wrong done to him (citing *Powell v. McCormack,* 395 U.S. 486, 496, 512–14 (1969))). Standing turns, rather, on whether plaintiffs have a *personal* interest. *Id*. at 829-30. A legislator whose vote is denied effect has suffered a personal injury to confer standing. *Id*. at 823-24 & n.6.

b. **Tenth Circuit precedent establishes that Plaintiffs have standing.**

*Kerr v. Hickenlooper*, 824 F.3d 1207 (10th Cir. 2016), also establishes Plaintiffs' standing. In that case several individual Colorado legislators challenged the constitutionality of a Colorado constitutional provision limiting the power of the Legislature to raise taxes. The court found that the crux of legislative standing is the nature of the injury alleged—whether the legislators-plaintiffs assert an "institutional injury" rather than "harm to an individual legislator." *Id*. at 1214.

> [A]n institutional injury constitutes some injury to the power of the legislature as a whole rather than harm to an individual legislator. An individual legislator cannot "tenably claim a personal stake" in a suit based on such an institutional injury.

*Id.*[2] The court explained that an "institutional injury" refers to a harm inflicted on a legislature, such that it necessarily impacts all members of that legislature in equal measure. *Id.* at 1215.

The court distinguished the personal injury in *Coleman*—which deprived individual Plaintiffs the efficacy of their own votes, "did not concern injury to the power of the legislature as a whole," and was not shared by all members of the Legislature—from the institutional injury in the case before it—which deprived the Legislature as an institution the ability to perform the "legislative core functions of taxation and appropriation." *Id.* at 1215.

---

[2] The court relied on *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015), which held that institutional injuries to a legislature's power *as a whole* (as opposed to personal injuries) had to be brought by an entire legislature to confer standing.

In ruling that those plaintiffs lacked standing, the Tenth Circuit was careful to clarify:

> In so holding, we do not suggest that an individual legislator can never bring suit. An individual legislator certainly retains the ability to bring a suit to redress a personal injury, as opposed to an institutional injury. For example, if a particular subset of legislators was barred from exercising their right to vote on bills, such an injury would likely be sufficient to establish a personal injury. See *Raines*, 521 U.S. at 824 n.7 (discussing similar hypotheticals).

*Id.* at 1216.

Plaintiffs fall within that example. The whole Kansas Legislature did not suffer a constitutional injury. Only those who voted with the majority and whose votes were denied effect have suffered this constitutional wrong and fit the scenarios offered in *Raines* and *Coleman*: that "they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated." *Raines*, 521 U.S. at 824. Accordingly, Plaintiffs have individual standing to challenge the constitutionality of the Kansas constitutional provision that rendered their votes ineffective.

## II. This Case Does Not Present a Political Question.

In ascertaining whether something is a political question today, court looks to whether there is a "a textually demonstrable constitutional commitment of the issue to a coordinate political department" and "a lack of judicially discoverable and manageable standards for resolving [the issue]." *Baker v. Carr*, 369 U.S. 186, 217 (1962).

Courts can, and often do, determine whether the action or procedure behind a legislative enactment was constitutional and whether a provision of a state constitution is, in fact, constitutional. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 940-42 (1983); *Hawke v. Smith*, 253 U.S. 221 (1920) (*Hawke I*); *Leser v. Garnett*, 258 U.S. 130 (1922). Neither issue is textually committed to another branch, nor involves a lack of judicially discoverable and manageable standards.

A long history of precedents addressing various legal issues arising under Article V demonstrates that this case is justiciable and does not present a political question. The U.S. Supreme Court has ruled on the merits on at least nine cases under Article V.[3] Various other federal courts have ruled on the merits of at least 11 additional cases.[4] A significant number of these 20 cases deal with the general subject matter of this present litigation—the authority of state

---

[3] *Kimble v. Swackhamer*, 439 U.S. 1385, 1387–88 (1978) (opinion of Rehnquist, Circuit Justice) (A voter's initiative that was purely advisory in character was not barred by Article V); *United States v. Chambers*, 291 U.S. 217 (1934) (once an amendment is ratified, it takes effect immediately, so current prosecutions under prohibition must cease); *United States v. Sprague*, 282 U.S. 716, 729-30 (1931) (Congress—not courts—determine the method of ratification of amendments); *Leser v. Garnett*, 258 U.S. 130, 136–37, (1922) (power to ratify comes from Article V; state constitutions cannot be used to limit that power); *Dillon v. Gloss*, 256 U.S. 368 (1921) (Congress has the power to fix a reasonable time for ratification as a component of its power to fix the method for ratification); *Hawke v. Smith*, 253 U.S. 221 (1920) (*Hawke I*) (the initiative and referendum process contained in state constitutions are not applicable to Article V) (vis-à-vis the 18th Amendment); *Hawke v. Smith*, 253 U.S. 231 (1920) (*Hawke II*) (same, but vis-à-vis the 19th Amendment); *State of Rhode Island v. Palmer*, 253 U.S. 350 (1920) (*National Prohibition Cases*) (several issues, including quorum requirement for votes in Congress, the use of initiative and referenda in ratification, and whether the subject matter of the Amendment was prohibited by the 10th Amendment); *Hollingsworth v. State of Virginia*, 3 U.S. 378 (1798) (lack of President's signature is irrelevant under Article V).

[4] *Illinois v. Ferriero*, 60 F.4th 704, 719 (D.C. Cir. 2023) (rejecting the argument that the ERA was still alive; Congress has the power to set deadlines, and they count); *Gralike v. Cook,* 191 F.3d 911, 924–25 (8th Cir. 1999) (term limits instructions challenge), *aff'd on other grounds*, 531 U.S. 510 (2001); *Miller v. Moore*, 169 F.3d 1119 (8th Cir. 1999) (state initiatives cannot be used to instruct federal and state candidates regarding term limits); *United States v. Thibault*, 47 F.2d 169, 172 (2d Cir. 1931) (rejecting argument that the 10th Amendment prohibited the subject matter of the 18th Amendment); *Barker v. Hazeltine*, 3 F. Supp. 2d 1088, 1092–93 (D.S.D. 1998) (use of the initiative process invalid in the Article V context); *League of Women Voters of Maine v. Gwadosky*, 966 F. Supp. 52, 56 (D. Me. 1997) (initiative process inapplicable to Article V process); *State of Idaho v. Freeman*, 529 F. Supp. 1107, 1155 (D. Idaho 1981) (ERA ratification deadline cannot be extended by Congress), *vacated sub nom. Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982); *Dyer v. Blair*, 390 F. Supp. 1291, 1303 (N.D. Ill. 1975) (state constitutional provision requiring a super-majority for an Article V was invalid); *Trombetta v. State of Fla.*, 353 F. Supp. 575 (M.D. Fla. 1973) (invalidating state constitutional provision requiring an intervening state legislative election before the ratification of a federal constitutional amendment); *United States v. Gugel*, 119 F. Supp. 897, 900 (E.D. Ky. 1954) (rejecting challenge to 14th Amendment under claim that legislatures were under duress to ratify it); *State of Ohio ex rel. Erkenbrecher v. Cox*, 257 F. 334 (S.D. Ohio 1919) (rejecting the argument that the 10th Amendment prohibited the subject matter of the 18th Amendment).

constitutions to control the Article V amendment process. In fact, five Supreme Court cases (*Leser*, *Dillon*, *Hawke I*, *Hawke II*, and *National Prohibition Cases*[5]) reached this issue on the merits. Six of the lower federal court opinions (*Gralike*, *Miller*, *Barker*, *Dyer*, *League of Women Voters of Maine*, *Trombetta*, *Erkenbrecher*[6]) also reached the merits on the constitutionality of applying state constitutions to the Article V process. All 11 of the cases dealing with the power of state constitutions to control the federal amendment process support the Plaintiffs' position on the merits, as detailed below.

The Supreme Court and numerous other federal courts have repeatedly reached the merits on the precise subject matter of this litigation. Accordingly, this case does not present a political question and can be resolved by a federal court. Two cases, in particular, directly address state constitutional provisions that purported to control voting by state legislatures in the Article V process. Both cases arose in the debates around the Equal Rights Amendment.

In *Dyer v. Blair*, 390 F. Supp. 1291, 1303 (N.D. Ill. 1975), a three-judge panel led by future Supreme Court Justice John Paul Stevens struck down the Illinois Constitution's requirement of a super-majority vote of the legislature to ratify a federal constitutional amendment. However, the court also held that a state legislature could, if it wished, impose such a requirement on itself through legislative rules.

*Dyer* explicitly rejected the claim that a challenge to the Illinois Constitution's super-majority rule raised a political question. "Thus, we conclude that petitioners' claim is not barred by the political question doctrine, and having determined that the claim is otherwise generally

---

[5] See n.3, *supra,* for full citations. This count does not include the opinion of Justice Rehnquist acting as a circuit justice in *Kimble.*
[6] See n.4, *supra,* for full citations.

9

justiciable, we hold that the case is justiciable." *Id.* at 1301. *Dyer* is identical to this case for the purposes of the political question doctrine.

A second, nearly identical case likewise rejected the application of the political question doctrine. In *Trombetta v. Florida*, 353 F. Supp. 575 (M.D. Fla. 1973), the court reached the merits on a challenge to the procedures dictated by that state's constitution for state legislative votes on Article V matters. The Florida Constitution required that there be an intervening state legislative election after a federal constitutional amendment was promulgated by Congress before the state legislature could consider ratification.

The court held that Article V alone controls the federal process, and the state constitution could not add rules binding the votes of the state legislature. Again, in yet another case involving state constitutions which purported to control state legislative votes on federal constitutional amendments, the court reached the merits. In fact, the issue was so well settled that the Attorney General of Florida did not even raise the political question doctrine in *Trombetta*.

The most extensive discussion of the political question doctrine in an Article V case is in *State of Idaho v. Freeman*, 529 F. Supp. 1107, 1123-46 (D. Idaho 1981). That court, too, rejected its application. Even though that case was later vacated as moot (because both ERA deadlines had expired), its treatment of the issue remains instructive. Finally, when the D.C. Circuit recently considered the current vitality of the Equal Rights Amendment, it reached the same conclusion on the merits as *Idaho v. Freeman* but did not even find it necessary to discuss the political question doctrine in the Article V context. *See generally Illinois v. Ferriero*, 60 F.4th 704 (D.C. Cir. 2023).

From this significant body of federal law, it is beyond question that the political question doctrine is no obstacle to litigation challenging state constitutional provisions which assert the authority to control a state legislature's federally conferred role in the Article V process.

**III.     This Case Can Be Adjudicated Under a Common Exception to the Mootness Doctrine.**

The Court should maintain jurisdiction and reach the merits, even though the 2024 legislative session expired while an unsuccessful motion to intervene caused the Court to hold merits briefing in abeyance. Under the "capable of repetition, but evading review" exception to the mootness doctrine, courts protect injured plaintiffs from the burden of having to repeatedly file constitutional claims that can never be completed in time. *Trombetta*, 353 F. Supp. at 576.

That doctrine often applies to challenges arising from cyclical activities like legislative sessions or elections. Not surprisingly, then, *Trombetta* long ago trod this ground in a challenge to a state constitutional provision that interfered with a state legislature's vote on an Article V matter. There, the Florida Constitution barred the Florida Legislature from voting on a federal constitutional amendment until an intervening state election had occurred subsequent to its submission to the States. After recognizing that an intervening election had, in fact, occurred while the litigation before it was pending, thus presenting the question of mootness, the court held that because of the substantial likelihood that the question presented would recur, "the issue remains justiciable and a declaratory judgment may be rendered to define the rights and obligations of the parties." *Trombetta*, 353 F. Supp. at 576.

> "The problem is therefore 'capable of repetition, yet evading review,' *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515 [1911]. The need for its resolution thus reflects a continuing controversy in the federal-state area ..." *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969). See also, *Dunn v. Blumstein*, 405 U.S. 33 (1972).

*Id.*

The equities for avoiding cyclical litigation—claims capable of repetition, yet evading review—are even stronger on this record than in *Trombetta*. In *Trombetta*, the required intervening election had taken place during the litigation. Thus, the "repetition" of the events giving rise to the

11

litigation was speculative: it would have occurred only in the event that some future federal constitutional amendments was proposed. Here, by contrast, the same application for an Article V convention will run into Kansas Const. art. II, § 3 repeatedly if this case is not adjudicated.

In 2025, it is unlikely that within one year, new resolutions can be introduced in each chamber, the committee process completed, chamber floor votes can occur, and litigation—through appeals—can be completed. This is an ongoing reality.[7] A challenge to the Kansas Constitution's interference with Article V is unlikely to be completed without claims of mootness. This case therefore presents the classic situation of a case that is capable of repetition but evading review. This Court should reach the merits.

## IV. The Kansas Constitution's Interference with the Federal Article V Process Is Unconstitutional.

On the merits, Plaintiffs have established that the Kansas Constitution's super-majority requirement is unconstitutional. The leading decision on the merits is the 1922 Supreme Court ruling in *Leser v. Garnett.* In that case, the Court heard a challenge to the 19th Amendment that 36 of the ratifying States had state constitutional provisions that "render[ed] inoperative the alleged ratifications by their legislatures." *Leser*, 258 U.S. at 137. The Court rejected this argument:

> [T]he function of a state Legislature in ratifying a proposed amendment to the federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the federal Constitution; and it transcends any limitations sought to be imposed by the people of a state.

---

[7] This same problem played out in 2024. A decision could have been reached by this Court before the end of the 2024 legislative session; judicial relief would then have had the effect of reinstating the Concurrent Resolutions of each House to the legislative docket, having been deemed passed by each of the respective Houses. Kan. Const. art. II, § 8. Then either House could have taken up the other's measure and, upon receiving a simple majority vote, it would have been deemed finally passed by the Kansas Legislature. In this case, the litigation plan was derailed by a motion to intervene and the accompanying abeyance of briefing on the merits.

*Id. Leser* relied on three prior cases: *Hawke I*, *Hawke II*, and the *National Prohibition Cases*. In all three, the Court addressed the constitutional propriety of using state constitutional initiative processes to ratify federal constitutional amendments. And in all three, the Court rejected that States could change the method of ratification from legislative bodies to a vote of the people via state constitutions. *Hawke I*, 225 U.S. at 226-27; *Hawke II*, 225 U.S. at 232; *National Prohibition Cases*, 253 U.S. at 386. Building on these decisions, *Leser* held that this categorical rule is not limited to the initiative process. *Leser*, 258 U.S. at 137. State constitutions may never restrict the power of state legislatures in carrying out their Article V functions.

Others have reached the same result. In *Dyer v. Blair*, future Justice Stevens held that Illinois's super-majority requirement (effectively identical to Kansas's), was unconstitutional. Citing *Leser*, the court said: "The power of a state legislature to ratify an amendment to the federal Constitution is derived from that instrument. By virtue of the supremacy clause in article VI it is clear that the legislature's ratifying function may not be abridged by a state." *Dyer*, 390 F. Supp. at 1303. In *Trombetta v. Florida*, a Florida federal district court reached the same conclusion. Florida's Constitution required an intervening state legislative election after a federal constitutional amendment was promulgated by Congress before the state legislature could consider ratification. The court held that Article V alone controls the federal process, and the state constitution could not add rules binding the votes of the state legislature. *Trombetta*, 353 F. Supp. at 578. Even the Attorney General of Kansas has acknowledged the unconstitutionality of Kansas Constitution Article 2, § 13. **Exhibit A**. The law on this point is absolutely settled.

V. <u>**The Legislative Rules of Kansas Are Not Applicable to This Litigation.**</u>

Defendants may argue that the Kansas House Rules, not the Kansas Constitution, independently bar ratification based on *Dyer v. Blair*. There, the Northern District of Illinois held

13

that the Illinois Constitution's super-majority requirement was unconstitutional, but the ERA majority ratification vote nonetheless failed because the Illinois Legislature created a super-majority rule in its own legislative rules, and "the resolution did not pass by the vote required by the applicable rules of procedure adopted by both houses of the legislature." *Dyer*, 390 F. Supp. at 1308–09. Thus, *Dyer* stands for the proposition that while a state constitution may not impose a super-majority requirement on itself, state legislatures retain autonomy in determining voting and quorum rules for their votes on Article V matters. Obviously, this portion of the *Dyer* opinion comes from a district court in another circuit and is not binding on this present litigation. But even if *Dyer* bound this Court, at least three other reasons make its determination about legislative rules inapplicable here.

First, the Defendants here have admitted that they were not following their own legislative rules when they concluded that each of the Concurrent Resolutions in question had failed. Each presiding officer has admitted that he relied *solely* on the Kansas Constitution in making his determination that these measures did not pass despite receiving a majority of the votes of each Chamber. **Doc. 1, at 5, ¶ 28**; **Doc. 6, at 3, ¶ 28**.

Second, the Kansas legislative rules for 2023-24 are not binding on future Kansas legislative sessions. Because this Court's ruling will only apply to future sessions, there is no basis for even considering the application of prior legislative rules. It would be entirely a matter of speculation to suggest that a future legislative session would adopt the same rules.

Third, even if binding on future sessions, the 2023-24 rules of the Kansas Senate contained no rules purporting to impose a super-majority requirement for the measure in question. *See generally Rules of the Kansas House of Representatives: 2023-2024 Biennium* (2023), https://kslegislature.gov/li/s/pdf/house_rules.pdf. The 2023-24 version of Kansas House Rule

2707(b) did not impose a two-thirds vote requirement; it simply referred to the requirement of the Kansas Constitution, by stating that a vote for application of a convention "*shall require the number of votes required by the Constitution of the state of Kansas to pass such concurrent resolution.*" *Id*. at 32. This contrasts with the 2021-2022 version of the same rule, which affirmatively imposed an independent requirement for a super-majority vote, by stating that a vote for application of a convention "shall require a 2/3 majority of the members then elected (or appointed) and qualified, voting in the affirmative." *Rules of the Kansas House of Representatives: 2021-2022 Biennium* 32 (2021), https://www.kslegislature.gov/li_2022/s/pdf/house_rules.pdf. The language of the 2023-24 version was clearly crafted to remove any suggestion that the Legislature imposed a super-majority requirement upon itself, while also avoiding any appearance of violating the Kansas Constitution.

Any of these reasons is sufficient for this Court to conclude that consideration of the Kansas House Rules is unnecessary.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request judgment on the pleadings and a declaratory judgment that the process of applying for a convention to propose amendments is a federal function derived from the federal Constitution, and that the Kansas Constitution's super-majority requirement for making such application is invalid.

<table>
<tr><td>

Dated: October 15, 2024

*/s/ Michael P. Farris*
Michael P. Farris
Washington Supreme Court No. 6883
660 N. Capitol Street NW, Suite 210
Washington, DC 20001
*Admitted Pro Hac Vice*
Tel: 202-341-4783
mfarris@cosaction.com
*Attorney for Plaintiffs*

</td><td>

Respectfully submitted,

*/s/ Edward D. Greim*
Edward D. Greim, No. 21077
Katherine E. Graves, No. 79151
Graves Garrett Greim LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105
Tel: 816-256-3181
Fax: 816-256-5958
edgreim@gravesgarrett.com
kgraves@gravesgarrett.com
*Attorneys for Plaintiffs*

</td></tr>
</table>

## CERTIFICATE OF SERVICE

      I do hereby certify that, on this 15th day of October 2024, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which gives notice of filing to all counsel of record.

*/s/ Edward D. Greim*
*Attorney for Plaintiffs*
