# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

| | |
|---|---|
| MIKE THOMPSON, Member of the Kansas Senate, in his official capacity, and MICHAEL MURPHY, Member of the Kansas House of Representatives, in his official capacity<br><br><br>*Plaintiffs*,<br><br>v.<br><br>TY MASTERSON, President of the Kansas Senate, in his official capacity, and DANIEL HAWKINS, Speaker of the Kansas House of Representatives, in his official capacity,<br><br><br>*Defendants*. | Case No. 5:23-cv-04120-TC-GEB |

## <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS</u>

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

MATERIAL FACTS ............................................................................................ 1

LEGAL STANDARD.......................................................................................... 3

MERITS ............................................................................................................... 3

A. The Case Presents a Non-Justiciable Political Question ........................................ 4

B. Article 2, Section 13 of the Kansas Constitution is Constitutional. ....................... 7

i. Article 2, Section 13 of the Kansas Constitution Leaves the Application Decision in the Hands of the State Legislature. ............................................................................... 7

ii. The History and Tradition of Article V at the time it was Drafted Demonstrates that Article 2, Section 13 of the Kansas Constitution is Valid. ................................ 10

iii. Application for a Convention Under Article V Is a Legislative Function. ........... 13

CONCLUSION.................................................................................................. 15

TABLE OF AUTHORITIEIES

**Cases**

*Baker v. Carr*, 369 U.S. 186 (1962) ............................................................... 4

*Baskin v. Thomas*, No. 5:23-CV-3212-JAR, 2024 WL 167341 (D. Kan. Jan. 16, 2024)

...................................................................................................... 3

*Coleman v. Miller*, 307 U.S. 433 (1939) ........................................................ 5

*Hawke v. Smith*, 253 U.S. 221 (1920) .................................................. 7, 13, 15

*Landmark Am. Ins. Co. v. VO Remarketing Corp*, 619 Fed.Appx. 705 (10th Cir.

2015)................................................................................................. 3

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)........................................ 4

*Moore v. Harper*, 600 U.S. 1 (2023)................................................... 9, 14, 15

*Morgan v. McCotter*, 365 F.3d 882 (10th Cir. 2004)..................................... 8

*Nixon v. United States*, 506 U.S. 224 (1993)........................................... 4, 6

*Oneida Indian Nation v. New York*, 691 F.2d 1070 (2d Cir. 1982).......... 10

*Rucho v. Common Cause*, 588 U.S. 684 (2019)........................................... 4

*Schroder v. Bush*, 263 F.3d 1169 (10th Cir. 2001) ..................................... 4

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) .............................................. 4, 5

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ................. 4, 6

**Other Authorities**

Elwill M. Shanahan, Sec'y of State, State of Kansas Election Statistics: 1974

Primary and Special Elections & 1974 General Election (1974).......................... 2

Michael B. Rappaport, *The Constitutionality of a Limited Convention: An

Originalist Analysis*, 28 Const. Comment. (2012)................................... 10

Robert G. Natelson, *Founding-Era Conventions and the Meaning of the

Constitution's "Convention for Proposing Amendments"*, 65 Fla. L. Rev. 615 (2013)

........................................................................................... 11, 13

## INTRODUCTION

Plaintiffs demand this Court strike down a duly adopted provision of the Kansas Constitution that has been in place for nearly fifty years. Their demand is monumental and requires equally monumental justification—which Plaintiffs do not have. During the 2023 regular session, the Kansas House of Representatives and the Kansas Senate each voted on a concurrent resolution that, if passed, would have applied to Congress to call a convention of states for the purpose of proposing amendments to the U.S. Constitution. Article 2, section 13 of the Kansas Constitution requires the affirmative vote of two-thirds of the members of each chamber to pass such legislation. In each chamber, a majority of members, but less than two thirds, supported the legislation. Because section 13's supermajority threshold was not met, the resolution did not pass.

Plaintiffs claim this supermajority provision is unconstitutional under Article V of the U.S. Constitution. They are wrong. To begin with, the Court does not even have subject-matter jurisdiction over this case because Plaintiffs' claim is a non-justiciable political question, which the Court should not hear.  Because of that, Plaintiffs' claims fail at step one. But even on the merits, none of Plaintiffs' arguments are persuasive because Section 13 is constitutional for three reasons: (1) application is a legislative function; (2) section 13 still leaves to the legislature the decision to apply for a convention; and (3) the history and tradition of Article V of the U.S. Constitution supports the idea that Kansas' section 13 is constitutional.

## MATERIAL FACTS

Article 2, section 13 of the Kansas Constitution requires the affirmative vote of at least two-thirds of the members of each chamber of the legislature in order to apply to Congress to call a convention for proposing amendments to the U.S. Constitution. Kan. Const. art. 2 § 13; *accord* Compl. ¶ 26, ECF 1; Answer ¶ 26, ECF 6. This portion of section 13 was adopted as a legislatively referred amendment in

1

1974. It was referred to the voters by a vote of 100-16 in the state House and 28-12 in the state Senate. H. JOURNAL, 66th Legis., at 799 (Kan. 1974), *available at* https://kgi.contentdm.oclc.org/digital/collection/p16884coll95/id/170; S. JOURNAL, 66th Legis., at 693 (Kan. 1974), *available at* https://kgi.contentdm.oclc.org/digital/collection/p16884coll95/id/172. Voters adopted the amendment with over 68% in favor. *See* Elwill M. Shanahan, Sec'y of State, State of Kansas Election Statistics: 1974 Primary and Special Elections & 1974 General Election, at 123 (1974), *available at* https://cdm16884.contentdm.oclc.org/digital/collection/p16884coll129/id/64/rec/5.[1] The supermajority requirement has remained in the Kansas Constitution.

The Kansas Senate's rules do not independently impose a supermajority requirement on applying to Congress for a convention of states. Compl. ¶ 27. Answer ¶ 27, ECF 6. However, the House's rules state: "Adoption of concurrent resolutions … to make any application for Congress to call a convention for proposing amendments to the Constitution of the United States *shall require the number of votes required by the Constitution of the state of Kansas to pass such concurrent resolution.*" Answer ¶ 27, ECF 6.

During its 2023 session, the Kansas Legislature considered two identically worded concurrent resolutions (House Concurrent Resolution 5008 and Senate Concurrent Resolution 1607) that would have applied to Congress for a convention of the states to propose amendments "impos[ing] limits on the federal government."[2] *E.g.*, Compl. ¶¶ 18, 23, ECF 1; Answer ¶¶ 18, 23, ECF 6. Seventy-four members of

---

[1] Although this is a motion for judgment on the pleadings, which excludes the consideration of extrinsic materials, the Court may still properly consider "matters of public record[ and] facts subject to judicial notice." Steven Baicker-McKee et al, Federal Civil Rules Handbook 488 (2020). The House and Senate votes are matters of public record, and the 1974 election results are public records and subject to judicial notice. *Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 617 n.2 (S.D.N.Y. 2020).

[2] It is odd that Plaintiffs ask a federal court to strike a state constitution provision.

the House (including Plaintiff Murphy) voted in favor of HCR 5008, and twenty-two members of the Senate (including Plaintiff Thompson) did the same for SCR 1607. Compl. ¶¶ 16, 17, 20, 21, 22, 25, ECF 1; Answer ¶¶ 16, 17, ,20, 21, 22, 25, ECF 6.

Neither vote reached the necessary two-thirds threshold. Therefore, each chamber's presiding officer (Defendant Hawkins in the House and Defendant Masterson in the Senate) declared that the respective resolutions were not adopted. Compl. ¶ 28, ECF 1; Answer ¶ 28, ECF 6. Both votes did represent a majority and but for the Kansas Constitution's two-thirds requirement, Defendants would have declared the resolutions adopted. Compl. ¶ 34, ECF 1; Answer ¶ 34, ECF 6.

## LEGAL STANDARD

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A Court evaluates Rule 12(c) motions "under the same standard applicable to a motion [to dismiss] under [Fed. R. Civ. P.] 12(b)(6)." *Landmark Am. Ins. Co. v. VO Remarketing Corp*, 619 Fed.Appx. 705, 708 (10th Cir. 2015); *see also Baskin v. Thomas*, No. 5:23-CV-3212-JAR, 2024 WL 167341, at *1 & n.9 (D. Kan. Jan. 16, 2024). Judgment on the pleadings under Rule 12(c) "requires the movant to establish an absence of any issue of material fact and entitlement to judgment as a matter of law." *Landmark*, 619 Fed.Appx at 708.

## MERITS

Plaintiffs have filed their complaint, Defendants have filed their answer, and, as far as Defendants are aware, Plaintiffs do not intend to amend the complaint. The parties have conferred and agree that, based on the pleadings, they have no dispute over any material fact. Rather, their dispute is solely over legal questions. J. Mot. to Close Pleadings & Stay Discovery ¶ 3, ECF No. 8. As shown below, the Court must dismiss Plaintiffs' claim because it presents a non-justiciable political

question, and no violation of the U.S. Constitution has occurred. Defendants therefore are entitled to judgment as a matter of law.

### A. The Case Presents a Non-Justiciable Political Question

The Court does not have subject-matter jurisdiction over this case because it presents a non-justiciable political question. Although "[i]t is . . . the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), "[s]ometimes . . . the law is that the judicial department has no business entertaining the claim of unlawfulness[, ]because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality) (citations omitted). In such a case, the claim is said to present a "political question" that is "outside the courts' competence and therefore beyond the courts' jurisdiction." *Rucho v. Common Cause*, 588 U.S. 684, 696 (2019) (citation omitted).

This doctrine is born of prudence, modesty, and a due respect for the separation of powers. *Schroder v. Bush*, 263 F.3d 1169, 1173 (10th Cir. 2001) (citations omitted). Courts lack constitutional authority to decide disputes in such circumstances. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).

Six circumstances can establish a political question:

> [1] [A] textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] ...a lack of judicially discoverable and manageable standards for resolving it; [3] ...the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] ...the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] ...an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). While these circumstances are often intertwined, *accord Nixon v. United States*, 506 U.S. 224, 228–29 (1993), the

4

existence of any one indicates by itself that a political question is present. *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005); *see also Vieth*, 541 U.S. at 277 (referring to *Baker* factors as "six *independent* tests" (emphasis added)).

At least four of these factors establish that a political question exists in this case and, therefore, the Court lacks jurisdiction to entertain the suit. To start, the U.S. Constitution explicitly commits the responsibility for calling a convention of states with Congress, once the requisite number of applications has been received. But it remains silent on what qualifies as a valid application. In the absence of textual instruction, Congress must decide for itself what qualifies as proper— particularly since another part of the Constitution explicitly gives Congress the power to "determine the Rules of its Proceedings," U.S. Const. art. I, § 5. Indeed, the Supreme Court has already held, in a case involving a different part of Article V's amendment process, that Congress is responsible for determining the Article's operation. In *Coleman v. Miller*, 307 U.S. 433 (1939), the courts were asked to set "a reasonable time for [state] ratification" of a proposed constitutional amendment. *Id.* at 452. But this question was not appropriate for review. *Id.* at 454. Whether ratification should have a time limit (and, if so, what it should be) was a question that only Congress could determine. *Id.* at 456. Similarly, this Court should recognize Congress' authority to make a final determination as to the validity of an application for a convention of states.

The second *Baker* factor also indicates a political question. This controversy lacks "judicially discoverable and manageable standards for resolving it." No convention for proposing constitutional amendments has ever been called. The Court, then—without any historical practice, precedent, or statutory guidance— would have to insert its own policy judgments to determine the validity of state Article V applications. And it would establish these policy judgments solely on the basis of the "Application" in Article V—a word which is not explained and which

appears, in the same context, in only one other section of the Constitution. *See Nixon*, 506 U.S. at 230 (finding that "the use of the word 'try' in the first sentence of the Impeachment Trial Clause lacks sufficient precision to afford any judicially manageable standard of review."); *see also* U.S. Const. art. IV, § 4.

Plaintiffs want to narrow this question to mere vote counting. But there is nothing in their logic that is so limited, and validity is more complicated than just the vote threshold. It might also include whether the proposed amendments have to be described in the application, whether there is sufficient subject matter overlap among different state applications, and the timing between state applications (which, for state ratification under Article V, the court in *Coleman* already decided was a political question). These are open questions that require weighing competing policies, lacking clear criteria on which a court can base its decision. *Cf. Zivotofsky*, 566 U.S. at 201 (finding sufficiently clear standards for justiciability when case could be resolved with "familiar principles of constitutional interpretation [and] careful examination of the textual, structural, and historical evidence put forward by the parties."). Congress is best suited to answer these questions.

The fourth and sixth *Baker* factors also point to a political question. The Court cannot decide this case without disrespecting Congressional prerogatives and risking contrary conclusions on the question that pit Congress (as the ultimate decider and actor under Article V) against the courts. Congress sets Article V policy when it chooses, or not, to call a constitutional convention. At that point, Congressional action, could render this case moot. For example, to accept the states' application to call a convention, Congress may decide to require supermajority votes from all states, or none of them; it may set strict expiration dates for approved state applications; or it may circumscribe the subject matter of the convention of states. If the Court were to weigh in prior to Congress, it would potentially put the Court on a collision where Congress may have a different view than the court. That would

create serious issues as Article V policy is solely in the purview of Congress. The bottom line is that these are discretionary political choices reserved for Congress. The Court would exercise respect by declining jurisdiction and refusing to make an "initial policy determination" that would lock Congress in to that policy.

In sum, four of the *Baker* factors show this case is a political question for Congress to decide. This is more than enough to prove the existence of a political question. Just as in *Coleman*, Kansas' application for a convention of states can be assessed by Congress and accepted or not. The question has been constitutionally committed to Congress, not the courts, and the courts would work ill to our constitutional system to short-circuit Congress' power in this area.

**B. Article 2, Section 13 of the Kansas Constitution is Constitutional.**

If the court were to reach the merits, Plaintiffs are not entitled to any relief because article 2, section 13 of the Kansas Constitution does not offend Article V of the federal Constitution. There are three primary reasons: (1) section 13 still leaves the power to apply for a convention solely in the hands of the state legislature; (2) the history and tradition of Article V demonstrate that states have full authority to determine how they decide to call a convention; and (3) state legislators are performing a legislative function when they call a convention for proposing amendments and are therefore bound by their state constitutions.

*i. Article 2, Section 13 of the Kansas Constitution Leaves the Application Decision in the Hands of the State Legislature.*

Article 2, section 13 is constitutional under Article V of the federal Constitution, because it is still the legislature, and no one else, who gets to decide whether to call for an application to propose amendments. This fact distinguishes this situation from the one in *Hawke v. Smith*, 253 U.S. 221 (1920). There, the Ohio legislature ratified a constitutional amendment, which Ohio residents then attempted to overturn via popular referendum. *Hawke*, 253 U.S. at 224–25. The

7

Court held that Article V's ratification requirement referred to state legislatures and excluded popular referenda. *Hawke*, 253 U.S. at 225. The Court noted:

> [T]he framers of the Constitution clearly understood and carefully used the terms in which that instrument referred to the action of the Legislatures of the states. When they intended that direct action by the people should be had they were no less accurate in the use of apt phraseology to carry out such purpose.

*Id.* at 228.

In contrast, article 2, section 13 of the Kansas Constitution keeps the decision with the legislature and simply provides the threshold of votes necessary apply for a convention of states. The ultimate decision whether to act remains with the legislature, which is sufficient for compliance with Article V. Furthermore, the Kansas House of Representatives willingly subjected itself to the supermajority requirement under its own House rules. House Rule 2707 states that an application for Congress to call for a convention of states "shall require the number of votes required by the Constitution of the state of Kansas" (i.e. a two-thirds supermajority of each house). Kan. H.R. 2707, *available at* https://www.kslegislature.gov/li/s/pdf/house_rules.pdf. By codifying this aspect of the Kansas Constitution in the House rule, the legislature is making its own a conscious decision to be bound by the supermajority requirement.[3]

Based on these facts, any argument that this provision of the Kansas Constitution is unconstitutional under Article V relies on the premise that the

---

[3] The legislature's conscious decision to be bound by the state constitution presents a separate justiciability issue of ripeness as it is questionable at best whether the court can address the constitutionality of article 2, section 13 of the Kansas Constitution while H.R. 2707 remains in place. A ripe issue is one fit for judicial decision, which "requires [the Court] to ask whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004). Here, the House may retain its rule even if the state constitutional requirement is vacated.

Constitution was intended to micromanage the states. That could not have possibly been the Framers' intent (for reasons discussed in more detail below). Consider the questions that would arise were it otherwise: Would the Constitution dictate whether states with a unicameral legislature like Nebraska be able to validly apply? Would the Constitution override any of the other states that require anything other than a pure majority vote to call for a convention? Would the Constitution micromanage what qualifies as a majority in situations such as when members aren't available for a vote or when members vote present? And, even if it did all that, where in the constitutional text would all these restrictions be located? Merely in the words "Application of the Legislatures"?

To suggest that in the absence of any explicit direction in the U.S. Constitution, states could not fill the gaps with their own constitutions, is odd. "Legislatures, the Framers recognized 'are the mere creatures of the State Constitutions, and cannot be greater than their creators.'" *Moore v. Harper*, 600 U.S. 1, 27 (2023) (quoting 2 Records of the Federal Convention of 1787, at 88 (M. Farrand ed. 1911)). While state legislatures exercise a federal constitutional power when calling for a convention to propose amendments, they do so "both as . . . lawmaking bod[ies] created and bound by [their] state constitution[s], and as the entit[ies] assigned particular authority by the Federal Constitution," *Moore*, 600 U.S. at 27. And Article V was never meant to micromanage the minutiae of how states exercise that power.

The decision to apply for a convention was meant to be an independent decision made by the states themselves. After all, the convention procedure was designed to protect state interests and preserve their ability to limit federal power. "Thus, George Mason . . . argued" for this part Article V—allowing states to propose amendments to the Constitution without Congressional approval—"'because [Congress] may abuse their power, and refuse their consent on that very account.'"

9

Michael B. Rappaport, *The Constitutionality of a Limited Convention: An Originalist Analysis*, 28 Const. Comment. 53, 60 (2012) (quoting James Madison, Notes of Debates in the Federal Convention of 1787, at 104–05 (W.H. Norton ed. 1987)). Plaintiffs miss this basic principle. They want a federal court to dictate how states should handle their business in calling for a convention. That was never what Article V was intended to do. All Article V requires is that the state legislatures make the decision to apply for a convention to propose amendments. The mechanics of how the legislature conducts that vote is left in the hands of each state.

> *ii. The History and Tradition of Article V at the time it was Drafted Demonstrates that Article 2, Section 13 of the Kansas Constitution is Valid.*

The provision of Article V that allows the states to apply to Congress to call a convention to propose amendments did not arise in a vacuum. The process of calling a convention among and within states was a tradition that preceded the Constitutional convention. When that history and tradition is appropriately examined it is clear that the intent of Article V was not to limit how states choose to exercise this power. One source of tradition on the matter is the conventions among states that occurred prior to the Constitutional Convention. For that there are three that stand out: (1) the Albany Convention of 1754, (2) the Stamp Act Congress of 1765, and (3) the Continental Congress of 1774. All three of these conventions predate Article V of the Constitution and provide insight into what the Framers intended. None support the idea that Article V limits states' method of application.

The Albany Convention of 1754 was a meeting of seven different British colonies, intended to address the threat of the French and Indian military collation. But it was most famous for its consideration of Benjamin Franklin's plan to unite the colonies. *See, e.g., Oneida Indian Nation v. New York*, 691 F.2d 1070, 1076 (2d Cir. 1982). Although there were twenty-one delegates that attended the convention between the seven colonies, each decided for itself how many delegates to send. For

instance, Massachusetts sent five delegates while Maryland sent only two. Robert G. Natelson, *Founding-Era Conventions and the Meaning of the Constitution's "Convention for Proposing Amendments"*, 65 Fla. L. Rev. 615, 634 (2013). In addition, the colonies decided for themselves how to select delegates, and did so in a variety of ways. Maryland had the governor make the selection. New York sent its "executive council." And four states had their legislatures elect the commissioners. *Id.* at 633. The Framers would have certainly known about this convention, and the wide variety of ways the states decided to send representatives, when deliberating on Article V.

The Albany Convention was not an anomaly. Other conventions used the same approach and accepted the varying selection methods of the states who decide to send representatives. The Stamp Act Congress of 1765, convened to determine the colonial response to the Stamp Act, was no different. Although the call's suggestion was for the lower house of each colony to elect commissioners, the colonies used their independent judgment. *Id.* at 635-36. For example, New York sent five New York City lawmakers as their delegation, while in Delaware out-of-session lawmakers chose the commissioners. *Id.* The convention seated all the delegates regardless. *Id.*

Once again with the Continental Congress of 1774 (which was a prelude to the Second Continental Congress that declared independence from Great Britain) uniformity was not the order of the day. In most colonies, the delegates who attended were chosen by a *de facto* legislative authority. *Id.* at 637. However, in other states there were methods such as a lower house selection or colonial conventions acting as legislatures. *Id.* In New York, the voters themselves elected delegates directly in local meetings. *Id.* The bottom line is this: if there was any evidence that the Framers intended to limit states' discretion in how to exercise their legitimate powers, that practice should show up in the history and tradition of

conventions where states gathered. It did not. The states themselves handled the details of how they elected to attend conventions and who to send.

Further history and tradition that contradicts the Plaintiffs' narrow reading of Article V are the state constitutions that existed at the time of the Constitutional Convention—constitutions of which the framing generation was obviously aware. The confederated states were varied in how they addressed the issue of calling a convention to amend their constitutions. For example, pt. II, ch. VI, art. X of the Massachusetts Constitution of 1780 required the legislature to call a convention when "two thirds of the qualified voters throughout the State, who shall assemble and vote in consequence of the said precepts, [vote] in favor of [revising the constitution], the General Court shall issue precepts, or direct them to be issued from the Secretary's office to the several towns, to elect Delegates to meet in Convention for the purpose aforesaid." Pennsylvania on the other hand created a council of censors that met every seven years to determine how well their government had upheld the Constitution. *See* Pennsylvania Constitution of 1776, § 47.[4] That council operated on a basis of majority of those in quorum, "except as to calling a convention, in which two-thirds of the whole number elected shall agree." Art. LXIII of the Georgia Constitution of 1777[5] took an entirely different approach:

> No alteration shall be made in this constitution without petitions from a majority of the counties, and the petitions from each county to be signed by a majority of voters in each county within this State; at which time the assembly shall order a convention to be called for that purpose, specifying the alterations to be made, according to the petitions preferred to the assembly by the majority of the counties as aforesaid.

The Framers were likely aware the variety of ways states structured the amendment process. By refusing to specify one method that would apply to all the states, they chose to continue to defer to the states to determine on their own how to

---

[4] *Available at* https://avalon.law.yale.edu/18th_century/pa08.asp.
[5] *Available at* https://avalon.law.yale.edu/18th_century/ga02.asp.

apply for a convention to propose constitutional amendments. Plaintiffs also cannot point to any direct evidence during the debates over Article V at the constitutional convention to support their position that state legislatures are somehow divorced from the usual confines of state law when applying for a convention. The available evidence shows otherwise. The main argument over Article V centered on whether Congress alone should have the power to amend the Constitution or whether states should also have a mechanism to do it themselves when necessary. The latter view ultimately won out precisely because some of the Framers were concerned that Congress would become abusive and block efforts to amend the Constitution in a manner that limits its power. George Mason expressed this concern and Gouvernor Morris and Elbridge Gerry proposed to remedy it by requiring Congress to call a convention to propose amendments upon the application of 2/3 of the states. Natelson, *supra*, at 621–22. In other words, this provision exists precisely for the benefit of the states when Congress became abusive—"to enable the states to propose amendments without a substantive veto by Congress." *Id*. at 622. That cannot be reconciled with federal control over how the states use their power.

  *iii. Application for a Convention Under Article V Is a Legislative Function.*

  Plaintiffs are likely to turn to *Hawke*, in an attempt to rebut the case for state control over the convention application process. In *Hawke*, the court wrote that "the power to ratify a proposed amendment to the federal Constitution has its source in the federal Constitution. The act of ratification by the state derives its authority from the federal Constitution to which the state and its people have alike assented." *Hawke*, 253 U.S. at 230. Unlike other legislative acts, "ratification by a state of a constitutional amendment is not an act of legislation within the proper sense of the word. It is but the expression of the assent of the state to a proposed amendment." *Id*. at 229.

*Hawke* admittedly deals with Article V, but the portion it discusses—
*ratification* of amendments—is fundamentally different from applications for a
convention of states. Ratification is a binary, up-or-down, consent-or-no choice—the
legislature either takes the amendment as presented or rejects it. Application is
more like an ordinary lawmaking function, where the legislature determines in the
first instance the scope, language, and purpose of the resolution. "When legislatures
make laws, they are bound by the provisions of the very documents that give them
life"—i.e., state constitutions. *Moore*, 600 U.S. at 27. In contrast, "a simple up-or-
down vote suffices to ratify an amendment to the [U.S.] Constitution," which is not
the same as when legislatures are fulfilling their ordinary role in republican
government. *See id.* at 29. Indeed, *Hawke* itself recognizes this distinction when it
notes "[Article V] makes provision for the proposal of amendments either by two-
thirds of both houses of Congress, or an application of the Legislatures of two-thirds
of the states; *thus securing deliberation and consideration before any change can be
proposed.*" 253 U.S. at 226 (emphasis added). But ratification is just the "expression
of the assent of the state to a proposed amendment." *Id.* at 229. Ratification is akin
to formal confirmation, while application involves further actions.

Applying for a convention of states is fits with this definition of "application."
It starts with a state legislature determining whether there is a need for a
constitutional amendment to begin with. Someone must draft the language of the
proposed application, and that language may be debated and amended. There may
also be debate as to whether the application includes proposed amendments or
whether that comes during the convention, and there would likely be some thought
given as to what specific amendments the state might propose if a convention is
called. It is only after these steps—which involve not just deliberation, but creative
and amendatory acts—that there is a yes or no vote. Ratification is a lot simpler.
This is due to the timing of when ratification happens. It happens after either a

14

convention or Congress proposes an amendment. At that point, all the creative and amendatory work is done. The legislature has to ability to exercise its ordinary lawmaking powers on the proposal; the only question is whether to accept it.

Thus, the application to call a convention is a lawmaking function, where the legislature creates and considers the issue from scratch rather than being presented with an option they cannot change and must either take or leave. In acting on such an application then, state legislatures, "are bound by the provisions of the very documents that give them life," *Moore*, <u>600 U.S. at 27</u>. In this case, that is the Kansas Constitution—including the supermajority requirement in article 2, section 13.  The Court should therefore find the legislature is bound by that provision. Any reading of *Hawke* that concludes states should be micromanaged goes against all of the history and tradition that existed at the time of Article V. Defendants do not agree with this reading of the case. Instead, the best reading of *Hawke* is narrow. It holds that a federal court can interpret the meaning of the term *state legislature* without resolving a political question, but gives no support for the proposition that federal courts have complete jurisdiction over Article V. Defendants' position that the Kansas state legislature should be left to decide what Article V explicitly authorizes for state legislatures is consistent with *Hawke*.[6]

## CONCLUSION

Plaintiffs are entitled to no relief and the court should dismiss their claim. Plaintiffs request oral argument on this motion.

---

[6] If *Hawke* is held to support federal control over state legislatures when they apply for a constitutional convention, then it may be time to overturn *Hawke*. A Supreme Court case, even one as old as *Hawke*, must still align with the history and tradition of the Constitution that it interprets. *Hawke* contained little to no analysis of the history and tradition of Article V. Had the Court looked into that history, it would have discovered much which cuts against Plaintiffs' claim that Article V dictates to the states the precise details of how they must decide to apply for a convention. Defendants wish to preserve this issue for appeal, and understand that a district court cannot overturn Supreme Court decisions.

Respectfully Submitted,


KRIS W. KOBACH
Attorney General of Kansas

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

This is to certify that on this 15th day of October, 2024, I electronically filed the above and foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli
*Counsel for Defendants*