In the United States District Court
for the District of Kansas

———————

Case No. 23-cv-04120-TC

———————

MIKE THOMPSON, ET AL.,

*Plaintiffs*

v.

TY MASTERSON, ET AL.,

*Defendants*

———————

## MEMORANDUM AND ORDER

Two Kansas state legislators filed suit against the leaders of the Kansas House and Senate, arguing that they applied a provision of the Kansas Constitution in a manner that violates Article V of the United States Constitution. Doc. 1. The parties have filed cross-motions for judgment on the pleadings, Docs. 33 and 35, and several proposed intervenor defendants have filed an objection to the Magistrate Judge's denial of their motion to intervene. Doc. 29. For the following reasons, Plaintiffs' motion for judgment on the pleadings is granted, Defendants' motion for judgment on the pleadings is denied, and the proposed intervenor defendants' objection is overruled.

## I

## A

Two of the pending motions implicate Federal Rule of Civil Procedure 12 and another implicates Federal Rule of Civil Procedure 72. Each rule has its own standard that governs resolution. The following describes each applicable standard.

1

1. When a magistrate judge issues a report and recommendation on a dispositive pretrial matter,[1] a party objecting to the recommendation must "serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). The district judge must then

> determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1). This means that objections to a magistrate judge's recommended disposition must be "both timely and specific to preserve an issue for de novo review by the district court . . . ." *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996). To be timely, the objection must be made within 14 days after service of a copy of the recommended disposition. Fed. R. Civ. P. 72(b)(2). Objections are sufficiently specific if they "focus the district court's attention on the factual and legal issues that are truly in dispute." *One Parcel of Real Prop.*, 73 F.3d at 1060. Where a party fails to make a proper objection, a district court may review the recommendation under any standard it deems appropriate, even for clear error. *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citations omitted); *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1125 (D. Colo. 2019).

2. Rule 12(c) permits any party to file a motion for judgment on the pleadings "[a]fter the pleadings are closed," which means "upon the filing of a complaint and answer." *Progressive Cas. Ins. Co. v. Estate of Crone*, 894 F. Supp. 383, 385 (D. Kan. 1995). When ruling on a motion under Rule 12(c), the court must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in that party's favor." *Martin Marietta Materials, Inc. v. Kansas*

---

[1] It is not clear that a motion to intervene is dispositive. *Contra* Doc. 29 at 1 n.1. There is debate among the district courts on this issue. *See, e.g., Nat'l Liab. & Fire Ins. Co. v. Carman*, No. 17-38, 2018 WL 4080576, at *1 n.1 (D.R.I. Aug. 27, 2018) (remarking on the dissension). Attempting to resolve that debate is unnecessary in this case because the standard does not affect the resolution. As a result, the Magistrate Judge's Order will be reviewed as if the issue is dispositive.

*Dep't of Transp.*, 810 F.3d 1161, 1171 (10th Cir. 2016). Judgment on the pleadings should not be granted "unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (quotation marks omitted). As with a motion to dismiss, the plaintiff's complaint must plead a plausible claim. *Martin Marietta*, 810 F.3d at 1171.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 556 (2007)). A claim need not be probable to be considered plausible. *Id.* But the facts, viewed in the light most favorable to the claimant, must adduce "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

## B

Two Kansas legislators—one Senator and one Representative—filed a lawsuit against the leaders of the Kansas Senate and the Kansas House of Representatives. Doc. 1.[2] The Plaintiffs are Mike Thompson, a member of the Kansas Senate, and Michael Murphy, a member of the Kansas House of Representatives. *Id.* at ¶¶ 12, 13. The two Defendants are Ty Masterson, the President of the Kansas Senate, and Daniel Hawkins, the Speaker of the Kansas House of Representatives. *Id.* at ¶¶ 14, 15.

**1.** The parties' dispute concerns the power of state "Legislatures" to request the Congress to convene a constitutional convention. In essence, there is a dispute as to whether the Kansas Constitution

---

[2] All document citations are to the document and page numbers assigned in the CM/ECF system.

conflicts with what the United States Constitution commands. In the event of a conflict, the United States Constitution controls. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (citing *Gibbons* v. *Ogden*, 22 U.S. 1, 9 (1824)) (noting that courts "shall regard the Constitution, and all laws made in Pursuance thereof, as the supreme Law of the Land," and that they "must not give effect to state laws that conflict with federal laws").

The claim at issue in this suit is grounded in Article V of the United States Constitution. That Article reads as follows:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or *on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments*, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

U.S. Const. art. V (emphasis added). The first half of the Article lays out three clauses concerning proposing amendments, applying for a convention, and ratifying a proposed amendment. *Id.* This dispute concerns the application clause.

More than a century ago, the Supreme Court—in a ratification clause case—interpreted the term "Legislatures" in Article V. The Court held that the term refers to "the representative body which made the laws of the people." *Hawke v. Smith*, 253 U.S. 221, 227 (1920). This is the meaning that the word was commonly understood to have at the founding. *Id.*; *see Legislature*, A Dictionary of the English Language (1st ed. 1755) ("The power that makes laws. Without the concurrent consent of all three parts of the legislature, no law is or can be made."). The Court has held that state legislatures' power under Article V to ratify a proposed amendment "has its source in the federal

Constitution." *Hawke*, 253 U.S. at 230. Because the power to ratify "is a federal function derived from the federal Constitution[,] it transcends any limitations sought to be imposed by the people of a state." *Leser v. Garnett*, 258 U.S. 130, 137 (1922).

The purported conflict arises in the language of Article II, Section 13 of the Kansas Constitution. That provision purports to limit the power of the Kansas Legislature to ratify an amendment or to apply for a constitutional convention by requiring a supermajority of the Legislature. It declares as follows:

> A majority of the members then elected (or appointed) and qualified of each house, voting in the affirmative, shall be necessary to pass any bill. *Two-thirds (2/3) of the members then elected (or appointed) and qualified in each house, voting in the affirmative, shall be necessary to ratify any amendment to the Constitution of the United States or to make any application for congress to call a convention for proposing amendments to the Constitution of the United States.*"

Kan. Const. art. II, § 13 (emphasis added). The Section was originally adopted by convention in 1861 as part of the Kansas Wyandotte Constitution without a supermajority requirement. That provision was added in 1974.[3] *See* 1974 Kan. Sess. Laws at 1536.

**2.** The historical facts in this case are undisputed. On March 22, 2023, simple majorities of the Kansas Senate and the Kansas House of Representatives voted to pass concurrent resolutions applying to the United States Congress for a constitutional convention. Doc. 1 at ¶¶ 1, 17, 22; *see* Docs. 1-1 & 1-2. These actions were part of the 2023 legislative session. Docs. 1-1 & 1-2. Despite the simple majorities, Defendants both (and separately) ruled that the concurrent resolutions did not pass because they did not receive two-thirds of the vote required by Article II, Section 13 of the Kansas Constitution. Doc. 1 at ¶¶ 3, 28, 29. Were it not for Section 13's supermajority requirement, Defendants

---

[3] It appears that the Kansas Supreme Court has not construed Section 13 in its current form. This is a case of first impression under Kansas law.

would have ruled that the concurrent resolutions passed.[4] *Id.* at ¶ 34.

Plaintiffs filed suit in federal court. Doc. 1. They bring a single count under 42 U.S.C. § 1983, arguing that Defendants' application of Article II, Section 13 of the Kansas Constitution to their affirmative vote in support of applying to Congress for a constitutional convention violates Article V of the United States Constitution. *Id.* at ¶ 40. They seek judgment declaring that the concurrent resolutions passed both chambers of the Kansas Legislature and were therefore adopted. *Id.* at ¶ 41.

Soon after Plaintiffs filed suit, several Kansas state senators and Kansas state representatives sought leave to intervene as defendants. Doc. 10. Magistrate Judge Birzer denied their request. Doc. 28. The proposed intervenor defendants now object to that ruling. Doc. 29. Both Plaintiffs and Defendants oppose that objection. Docs. 30 & 31.

Both sides move for judgment on the pleadings. Docs. 33 & 35. Plaintiffs request declaratory judgment that Article II, Section 13 of the Kansas Constitution violates Article V of the United States Constitution. Doc. 39-1. Defendants request judgment as well, arguing that this case presents a nonjusticiable political question and that Section 13 is constitutional. Doc. 38-1.

## II

The proposed intervenor defendants are adequately represented by the Defendants. And Article II, Section 13 of the Kansas Constitution seeks to restrict the power conferred by Article V of the United States

---

[4] At the time of the vote, the Kansas House of Representatives had a rule that referenced Section 13's supermajority requirement. That rule, which has since been repealed, was not the basis of Defendants' decision; their ruling on the vote never mentioned the House rule and only relied on Section 13 as the basis of the decision. Doc. 1 at ¶ 28. As a result, it does not permit dismissing Plaintiffs' claim as one that is not a live case or controversy or somehow not yet ripe. *Contra* Doc. 38-1 at 11. Not only did it play no role in the challenged decision, but the rule did not independently impose a supermajority requirement; it merely referenced the Kansas Constitution's requirement. *Id.* at 11 (noting that the rule required "the number of votes required by the Constitution of the state of Kansas"). As a result, it has no bearing on the merits of Section 13 or any issue in this litigation. Doc. 49; *see* Rules of the Kansas House of Representatives, 2025-2026 Biennium § 2707(b).

Constitution. Accordingly, the proposed intervenor defendants' objection is overruled, the Defendants' motion is denied, and the Plaintiffs' motion is granted.

## A

There are several matters presented in the parties' briefs and related procedural history that must be addressed before the merits of the alleged conflict can be considered. Each is explained more fully below.

### 1

The proposed intervenor defendants object to Judge Birzer's denial of their motion to intervene. Doc. 29. They argue that Judge Birzer erred when she found that their interests were adequately represented by the Defendants. Doc. 29 at 7–8.

Intervention is governed by Federal Rule of Civil Procedure 24. That rule allows intervention as of right for anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). To intervene, movants must show that their application is timely, that they claim an interest in the subject of the action, that their interest may be impaired, and that their interest is not adequately represented by the defendant. *Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1113 (10th Cir. 2017). The only dispute is whether Defendants adequately represent the proposed intervenor defendants' interests. Docs. 17 at 1–3 & 20 at 2; Doc. 29 at 1–2.

Judge Birzer's conclusion that the proposed intervenor defendants are adequately represented is correct. *Contra* Doc. 29 at 26. The Tenth Circuit has succinctly stated the governing rule: "When the applicant and an existing party share an identical legal objective, we presume that the party's representation is adequate." *Barboan*, 857 F.3d at 1113–14. The proposed intervenor defendants and the Defendants have identical interests in that their legal objective is to uphold Section 13's supermajority requirement. *Compare* Doc. 38-1 (seeking to uphold the constitutionality of Section 13), *with* Doc. 10-1, *and* Doc. 11 (same). As a result, the proposed intervenor defendants' objection is overruled. *See Barboan*, 857 F.3d at 1114 (denying motion to intervene on appeal

because the intervenor and a party had "the same legal objective"); *Tri-State Generation & Transmission Ass'n, Inc. v. New Mexico Pub. Regul. Comm'n*, 787 F.3d 1068, 1073 (10th Cir. 2015) (affirming the district court's denial of a motion to intervene when the intervenors and the defendants had "identical litigation objectives").

The proposed intervenor defendants' counter arguments are unpersuasive. They contend that they are not adequately represented because they have different political goals from the defendants. Specifically, they argue that Defendant Masterson has previously stated that he hoped to pass the resolutions at issue to "settle the question of what's required for Kansas to [call for a convention]." Doc. 29 at 7. And they further argue that the Kansas Attorney General, who is tasked with defending Section 13 in this litigation, has "personally expressed support for a constitutional convention." *Id.* These arguments are a *non sequitur*. For one thing, political speech is not always an indication of an actor's true intent. *See FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 467–69 (2007) (remarking on the incongruence between speech and intent). And for another, the critical inquiry is the legal objective of the Defendants. Differing political calculations between the Defendants and the proposed intervenor defendants is immaterial because they are united in their desire to uphold the provision of the Kansas Constitution. *Statewide Masonry v. Anderson*, 511 F. App'x 801, 806–07 (10th Cir. 2013) (citing *Bottoms v. Dresser Indus., Inc.,* 797 F.2d 869, 872–73 (10th Cir. 1986)) (noting that "their common objective . . . is the controlling consideration"). Finally, there has been no showing that Defendants are failing to meaningfully advocate for this legal position. The substance of Defendants' arguments offered in support of Section 13 is robust, meaningful, and, more telling, not materially different from those of the proposed intervenor defendants. *Compare* Doc. 38-1, *with* Docs. 10, 10-1, 29. Because the proposed intervenor defendants do not contest that they share the common objective with the Defendants of upholding Section 13, their attack on Judge Birzer's decision fails.

## 2

Defendants argue that this case presents a nonjusticiable political question. Doc. 38-1 at 20. Resolution of that argument is guided by the six factors first identified in *Baker v. Carr*, 369 U.S. 186, 217 (1962); *see Hanson v. Wyatt*, 552 F.3d 1148, 1159 (10th Cir. 2008).

Article III of the Constitution gives federal courts a non-delegable duty to decide cases and controversies before them, *Marbury v. Madison*, 5 U.S. 137, 173–74 (1803), even those they "would gladly avoid." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quotation marks omitted). There is a limited—and narrow—exception to this rule known as the political question doctrine. *Id.* When a case presents a political question, courts lack the authority to decide it, and the dispute is considered nonjusticiable. *Id.*

The Court has laid out six factors that are important in the analysis of whether a case presents a political question. These factors are as follows:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Hanson*, 552 F.3d at 1159–60 (quoting *Baker*, 369 U.S. at 217) (alterations in original). The Court pays particular attention to the first two factors. *See Zivotofsky*, 566 U.S. at 195 ("We have explained that a controversy involves a political question where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.") (quotation marks and alterations omitted).

This case does not present a political question. *Contra* Doc. 38-1 at 7. Instead, it presents a straightforward constitutional question: Whether Article V permits limits on when and how state legislatures exercise their application power. As numerous cases have held, that is a question that is textually committed to the judiciary. *Dyer v. Blair*, 390 F. Supp. 1291, 1301 (N.D. Ill. 1975) (Stevens, J.) (concluding that a ratification claim under Article V was not a political question); *State of*

*Idaho v. Freeman*, 529 F. Supp. 1107, 1124–46 (D. Idaho 1981) (thoroughly analyzing the question and concluding the same), *vacated on other grounds by Carmen v. Idaho*, 459 U.S. 809, 103 S. Ct. 22 (1982). And declaring what the text of the Constitution means is a familiar endeavor for federal courts. *See Zivotofsky*, 566 U.S. at 201 (noting that "is what courts do"). Moreover, there is no policy determination at play or a need to defer to a coordinate branch of government. *See Powell v. McCormack*, 395 U.S. 486, 548–49 (1969). Finally, no political decision has been made such that there is a need to adhere to it or that judicial action would create multifarious pronouncements.

Defendants' arguments to the contrary are unavailing. They argue that several of the *Baker* factors point to a political question. Doc. 38-1 at 8. Specifically, they focus their arguments on whether there has been a valid application for a convention, and they contend that resolution of *that* question is political. *See* Doc. 38-1 at 8–9. But that is not a question presented by the Plaintiffs' complaint. The sole dispute is whether the Kansas Constitution can limit the Kansas Legislature's ability to call for a convention under Article V. That question is one of pure constitutional interpretation, and it falls squarely within the province of the judiciary. *Marbury*, 5 U.S. at 177; *Powell*, 395 U.S. at 548–49. What Congress might choose to do with such an application is up to Congress to decide.

### 3

Another preliminary question is whether Plaintiffs have standing to sue. Plaintiffs rely on the doctrine of legislative standing. Doc. 39-1 at 7.

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2, cl. 1); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "For there to be a case or controversy under Article III, the plaintiff must have . . . standing." *TransUnion*, 594 U.S. at 423. "Regardless of the stage of litigation at which [federal courts evaluate] standing, the standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). Plaintiffs "must demonstrate standing separately for each form of relief sought." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (quoting *Friends of the*

*Earth, Inc. v. Laidlaw Env't Serv. (TOC), Inc.*, 528 U.S. 167, 185 (2000)) (internal quotation marks omitted).

Whether Plaintiffs have standing is directly answered by *Coleman v. Miller*, 307 U.S. 433 (1939).[5] In that case, the Supreme Court held that individual legislators whose votes would have been sufficient to defeat a resolution ratifying a proposed amendment to the Constitution had standing to sue. *Coleman*, 307 U.S. at 446. *Coleman* stands "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines v. Byrd*, 521 U.S. 811, 823 (1997).

As in *Coleman*, the Plaintiffs here have standing because their votes were completely nullified. Plaintiffs' votes would have been sufficient to apply for a constitutional convention were it not for Section 13. Doc. 1 at ¶ 34. Thus, Plaintiffs complain of the same individual injury that the Supreme Court recognized in *Coleman*. *See Coleman*, 307 U.S. at 438 (finding standing because legislators' "votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient"); *Kerr v. Hickenlooper*, 744 F.3d 1156, 1171 (10th Cir. 2014) (affirming the district court's finding of legislative standing where legislators "alleged an injury to the plain, direct and adequate interest in maintaining the effectiveness of their votes") (quotation marks omitted), *vacated on other grounds by Hickenlooper v. Kerr*, 576 U.S. 1079 (2015); *cf. Raines*, 521 U.S. at 824 (finding no standing because the plaintiffs "have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated").

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015), confirms this conclusion. In that case, the Arizona Legislature filed suit arguing that an Arizona initiative that removed redistricting authority from the state legislature and placed it in an independent commission violated the Elections Clause of the U.S. Constitution. *Arizona State Legislature*, 576 U.S. at 792. The Court found that the Arizona Legislature had standing because the injury at issue

---

[5] Defendants make no argument that Plaintiffs lack standing. *See generally* Docs. 38-1 & 45. Nonetheless, federal courts have a responsibility to ensure that plaintiffs have standing. *Friends of the Earth*, 528 U.S. at 180.

was akin to that in *Coleman*. *Id.* at 803. Specifically, the state initiative would "completely nullify any vote by the Legislature, now or in the future, purporting to adopt a redistricting plan." *Id.* (quotation marks omitted). That injury is synonymous with Plaintiffs' injury here. Section 13 nullified Plaintiffs' vote. Were it not for Section 13, Plaintiffs' vote would have been sufficient to pass the concurrent resolutions. This is the type of injury that the Supreme Court recognized in *Coleman* and *Arizona State Legislature*.

### 4

Finally, it is not immediately clear that this is a live dispute. As noted above, the Kansas Legislature passed the two concurrent resolutions at issue in 2023. Doc. 1 at ¶ 1. That legislative session ended before the issue presented in Plaintiffs' complaint was resolved.

Federal courts may only adjudicate actual controversies. U.S. Const. art. III, § 2, cl. 1. Courts may not decide questions that do not affect the rights of the parties or "give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Because this requirement persists through all stages of federal judicial proceedings, "it is not enough that a dispute was very much alive when suit was filed . . . ." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990). "[A] suit becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin*, 568 U.S. at 172.

There are exceptions to that rule. One arises when the dispute is "capable of repetition, yet evad[es] review." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016). It applies where the challenged action is in its duration too short to be fully litigated prior to cessation or expiration and there is a reasonable expectation that the same complaining party will be subject to the same action again. *Kingdomware Techs.*, 579 U.S. at 170. "In deciding whether a case is moot, the crucial question is whether granting a present determination of the issues offered [ ] will have some effect in the real world." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1165 (10th Cir. 2023) (quotation marks omitted).

This case qualifies as an exception. *Cf. Trombetta v. State of Fla.*, 353 F. Supp. 575, 576 (M.D. Fla. 1973) (finding that a ratification challenge under Article V fit under the exception because declaratory judgment was necessary to define the rights of the parties). The concurrent resolutions at issue are not amenable to quick litigation before a legislative

session is finished—in Kansas the legislative session is typically only from January through April. Thus, this controversy is likely to emerge again given the quick cyclical nature of legislative sessions in Kansas. *Cf. Rio Grande Found.*, 57 F.4th at 1166 (noting that challenges to election laws readily meet the exception requirement because "injuries from such laws are capable of repetition every election cycle yet the short time frame of an election cycle is usually insufficient for litigation in federal court"). And a determination of the issue would have real effect in the real world. *See id.* (finding that a dispute was not moot because "determining the law's constitutionality would have a real effect on [the plaintiff]").

**B**

Plaintiffs challenge the constitutionality of Article II, Section 13 of the Kansas Constitution. They argue that that Section violates the application clause of Article V of the United States Constitution because it purports to restrict how the Kansas Legislature may exercise the application power.

**1**

There appears to be no controlling precedent interpreting the application clause under Article V of the Constitution. But there is controlling and persuasive precedent interpreting the identical language of Article V's ratification clause. That matters because district courts are bound by the reasoning of the Supreme Court almost as firmly as by its holdings. *See United States v. Guillen*, 995 F.3d 1095, 1114 (10th Cir. 2021) (quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996)) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *United States v. Bd. of Cty. Comm'rs of Otero*, 843 F.3d 1208, 1214 (10th Cir. 2016) ("We have no authority to reject the reasoning behind a Supreme Court holding."); *United States v. Duvall*, 740 F.3d 604, 609 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[T]he *reasoning* of a Supreme Court case also binds lower courts.") (emphasis in original). And importantly, neither Defendants nor the proposed intervenor defendants identify any caselaw to the contrary.

The Supreme Court examined state legislatures' power to ratify amendments under Article V in *Hawke v. Smith*, 253 U.S. 221 (1920). In that case, the Court analyzed a provision of the Ohio Constitution that attempted to limit the ratification power by taking it from the

13

legislature and giving it to a popular vote by way of a referendum. It stated that "[t]he people . . . reserve to themselves the legislative power of the referendum on the action of the General Assembly ratifying any proposed amendment to the Constitution of the United States." *Hawke*, 253 U.S. at 225. The Court struck down the Ohio constitutional provision, holding that "ratification by a state of a constitutional amendment is not an act of legislation within the proper sense of the word," and that "the power to ratify a proposed amendment to the federal Constitution has its source in the federal Constitution." *Id.* at 230. The Court noted that "[t]he act of ratification by the state derives its authority from the federal Constitution" and, therefore, Ohio did not have the authority to impose a referendum requirement on its legislature's ratifications of amendments. *Id.* at 230, 231.

The Court applied *Hawke* in *Leser v. Garnett*, 258 U.S. 130 (1922). In *Leser*, two women registered as qualified voters in Baltimore. *Leser*, 258 U.S. at 135. The plaintiff filed suit to have the women's names stricken from the voter roll on account of the Maryland Constitution, which denied women the franchise. *Id.* The Nineteenth Amendment and its guarantee to women of their right to vote had been ratified, although not by Maryland. The plaintiffs argued that the Amendment was not part of the federal Constitution because several of the states that ratified it had provisions in their constitutions that, according to the plaintiffs, rendered those states' ratifications inoperative. *Leser*, 258 U.S. at 136–37. Applying *Hawke* and Article V's text, the Supreme Court rejected the plaintiff's argument, noting that "the function of a state Legislature in ratifying a proposed amendment to the federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the federal Constitution; and it transcends any limitations sought to be imposed by the people of a state." *Id.* at 137. In other words, any constraints imposed by the states' constitutions affecting the Article V power were ineffective.

Although *Hawke* and *Leser* dealt with the ratification clause rather than the application clause, the text of Article V suggests that their

14

logic applies to state legislatures' applications as well as ratifications.[6] Article V uses the same term, "Legislatures," in both the ratification clause and in the application clause. And both clauses are laid out as parallels. This context and structure suggest that the clauses should be read harmoniously; there is no textual basis to reach a different conclusion. *See* Antonin Scalia & Bryan A. Gardner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text . . . ."). Indeed, it makes no logical sense that a state legislature's power to *ratify* constitutional amendments may not by infringed by state constitutional provisions seeking to limit their authority (as *Hawke* and *Leser* recognized), but their power to *apply* for a constitutional convention may be.

Circuit courts in other jurisdictions have applied *Hawke* and *Leser* to other Article V cases that were not limited to the ratification clause. In *Miller v. Moore*, 169 F.3d 1119 (8th Cir. 1999), the Eighth Circuit analyzed an amendment to the Nebraska Constitution that instructed "each of Nebraska's representatives in Congress to use all of his or her delegated powers to pass the specified term limits amendment." *Miller*, 169 F.3d at 1122 (quotation marks omitted). The amendment also instructed Nebraska legislators "to apply to Congress for a national convention." *Id.* (citation omitted). Relying on *Hawke* and *Leser*, the Eighth Circuit struck down the Nebraska constitutional provision. *Id.* at 1124 ("We therefore conclude that Nebraska's Article XVIII is an unconstitutional attempt effectively to remove the Article V power from legislators and to place it in the hands of the people, thus substituting popular will for the will of the independent deliberative assemblage envisioned by the framers of the Constitution.") (citation and quotation marks omitted). The court found that the Nebraska provision undermined representative government by permitting the people to directly control the state legislature's Article V power. *Id.*

The Eighth Circuit applied *Miller* in a similar challenge to the Missouri Constitution. In *Gralike v. Cook*, a Missouri Constitution

---

[6] This proposition has been recognized in the academic literature for decades. *See* Jonathan L. Walcoff, *The Unconstitutionality of Voter Initiative Applications for Federal Constitutional Conventions*, 85 COLUM. L. REV. 1525, 1537 (1985) ("While Hawke and Leser were ratification clause cases, their analysis applies equally to the proposal clause."); Robert G. Natelson, *Proposing Constitutional Amendments by Convention: Rules Governing the Process*, 78 TENN. L. REV. 693, 710 (2011) (concluding the same).

provision "order[ed] members of Missouri's congressional delegation to use their authority to amend the United States Constitution." *Gralike v. Cook*, 191 F.3d 911, 915 (8th Cir. 1999), *aff'd*, 531 U.S. 510 (2001). Again relying on *Hawke* and *Leser*, the court struck down the provision. *Id.* at 925–26. The court noted that "Supreme Court precedent supports the conclusion that the people have a limited, third-party role in the amendment process." *Id.* at 924. Because the Missouri Constitution sought to limit the state legislature's power to amend the federal Constitution, it ran afoul of Article V. *See id.* at 924–25 ("Article V envisions legislatures acting as freely deliberative bodies in the amendment process and resists any attempt by the people of a state to restrict the legislatures' actions."); *see also Cook v. Gralike*, 531 U.S. 510, 518 (2001) (affirming and noting that the circuit court's decision was "consistent with the views of other courts that have passed on similar voter initiatives").

District courts are also in accord. In two cases, *Trombetta v. State of Fla.*, 353 F. Supp. 575 (M.D. Fla. 1973), and *Dyer v. Blair*, 390 F. Supp. 1291 (N.D. Ill. 1975), district courts contended with limits on state legislatures' ratification power. In one, the Florida Constitution provided that "[t]he legislature shall not take action on any proposed amendment to the constitution of the United States unless a majority of the members thereof have been elected after the proposed amendment has been submitted for ratification." *Trombetta*, 353 F. Supp. at 575. In the other, the Illinois Constitution provided that "[t]he affirmative vote of three-fifths of the members elected to each house of the General Assembly shall be required to request Congress to call a Federal Constitutional Convention, to ratify a proposed amendment to the Constitution of the United States, or to call a State Convention to ratify a proposed amendment to the Constitution of the United States." *Dyer*, 390 F. Supp. at 1295. Both provisions were precluded by Article V, with each of the district courts relying on *Hawke* and *Leser* to hold that states may not impose any limits on their legislatures' Article V powers. *See Trombetta*, 353 F. Supp. at 578; *Dyer*, 390 F. Supp. at 1308 ("[A]rticle V delegates to the state legislatures—or the state conventions depending upon the mode of ratification selected by Congress—the power to determine their own voting requirements. The decisions of the Supreme Court, as well as the text of article V, illuminate the critical point that the delegation is not to the states but rather to the designated ratifying bodies.").

*League of Women Voters of Maine v. Gwadosky*, 966 F. Supp. 52 (D. Me. 1997), is also instructive. In that case, the District of Maine looked at a Maine statute that directed the Maine Legislature and Governor to enact a term-limits amendment to the federal Constitution. *League of Women Voters of Maine*, 966 F. Supp. at 54. The district court struck down the statute, noting that "[i]t is not within the province of the citizens of a state to *propose* or ratify amendments to the Constitution." *Id.* at 56 (emphasis added). Commenting on *Hawke* and *Leser*, the court noted:

> *Hawke* and *Leser* would seem to indicate that the role of the people as citizens of both the various states and the United States in amending the Constitution is strictly limited to electing their state and federal officials. It appears, from these two decisions, to be within the exclusive province of the U.S. Congress and the state legislatures to deliberate and act upon potential amendments to the Constitution, unencumbered by any influences from the people who elected their law-makers.

*Id.* at 57. Because a citizen's role is "outside the Article V process," *id.* at 59, the court found the Maine statute unconstitutional. *Id.* at 63. The statute violated Article V because it sought to prevent Maine legislators from acting "in the deliberative and independent manner required by Article V of the Constitution." *League of Women Voters of Maine*, 966 F. Supp. at 63.

Several state supreme courts have held the same. At least six state supreme courts have concluded that Article V does not tolerate any encroachment on state legislature's Article V power. *See generally Opinion of the Justices to the Senate*, 366 N.E.2d 1226 (Mass. 1977); *State ex rel. Harper v. Waltermire*, 691 P.2d 826 (Mont. 1984); *Am. Fed'n of Lab. v. Eu*, 686 P.2d 609 (Cal. 1984) (en banc); *Donovan v. Priest*, 931 S.W.2d 119 (Ark. 1996); *In re Initiative Petition No. 364*, 930 P.2d 186 (Okla. 1996); *Morrissey v. State*, 951 P.2d 911 (Colo. 1998). Of those, two decisions dealt specifically with the application clause. *See Waltermire*, 691 P.2d 826; *Eu*, 686 P.2d 609.

In *Waltermire*, a Montana initiative directed the Montana state legislature to apply for a constitutional convention. The Montana Supreme Court struck down Montana's initiative by relying on *Hawke* and

*Leser.* Its commentary on *Hawke* and the power of state legislatures acting pursuant to Article V is illuminating:

> The discussion in *Hawke* of legislatures in the context of the amendment ratification clause of Article V is equally applicable to the application clause. There is no reason that the framers would have ascribed different meanings to the two instances in which they used the word "legislatures" within the same sentence of Article V. A legislature making an application to Congress for a constitutional convention under Article V must be a freely deliberating representative body . . . . [W]e find that whenever a state legislature acts to amend the United States Constitution under Article V powers, the body must be a deliberative representative assemblage acting in the absence of any external restrictions or limitations.

*Waltermire*, 691 P.2d at 830.

The California Supreme Court faced a similar issue in *Eu.* In that case, a California initiative compelled the California Legislature to apply to Congress for a constitutional convention to discuss a balanced-budget amendment. *Eu*, 686 P.2d at 611. The California Supreme Court first decided that the dispute was justiciable. *Id.* at 617. It then proceeded to the merits, holding that "a state may not, by initiative or otherwise, compel its legislators to apply for a constitutional convention, or to refrain from such action. Under Article V, the legislators must be free to vote their own considered judgment, being responsible to their constituents through the electoral process." *Id.* at 622. The state Supreme Court explained as follows:

> We have concluded that the initiative, to the extent that it applies for a constitutional convention or requires the Legislature to do so, does not conform to article V of the United States Constitution. Article V provides for applications by the "Legislatures of two-thirds of the several States," not by the people through the initiative; it envisions legislators free to vote their best judgment, responsible to their constituents through the electoral process, not puppet legislators coerced or compelled by loss of salary or otherwise to vote in favor of a proposal they may believe unwise.

18

*Id.* at 613.

**2**

Section 13 offends Article V just like each of the similar provisions discussed above. It purports to restrict the Kansas Legislature's application power by requiring the assent of a supermajority of legislators to apply for a constitutional convention. That effort fails because the application power is conferred not by state law, but by Article V itself. *Hawke*, 253 U.S. at 230; *Leser*, 258 U.S. at 137. And, as the Eighth Circuit recognized in *Gralike*, "Article V envisions legislatures acting as freely deliberative bodies in the amendment process and resists any attempt by the people of a state to restrict the legislatures' actions." *Gralike v. Cook*, 191 F.3d 911, 924–25 (8th Cir. 1999), *aff'd*, 531 U.S. 510 (2001). The only role the citizenry has in exercising Article V power is to elect its representatives to the legislature, and when the framers of the Constitution "intended that direct action by the people should be had they were no less accurate in the use of apt phraseology to carry out such purpose." *Hawke*, 253 U.S. at 228. Once that is done, Article V power may only be exercised by the representative legislative body. The legislature may choose to apply or they may not. And they may insist on internal limits as to how, and under what circumstances, they will act. But any state attempt to limit or inhibit the legislature's prerogative—whether by way of directing them how to vote, directing what action to take, or establishing a threshold for what constitutes legislative assent—trenches upon the federal power the framers conferred upon the state legislatures. *Id.* at 230; *Leser*, 258 U.S. at 137.

Defendants do not argue to the contrary. Indeed, they have failed to identify a single case where any similar effort to restrict Article V power has succeeded. That is not surprising, as none of the authorities have done so either.

Instead, Defendants offer three counterarguments in response. Doc. 38-1 at 10. None are persuasive.

Defendants first argue that Section 13 is constitutional because it "still leaves the power to apply for a convention solely in the hands of the state legislature." Doc. 38-1 at 10. Specifically, Defendants argue that the Kansas Constitution "simply provides the threshold of votes necessary [to] apply for a convention of states." *Id.* at 11. But Section 13 does not leave *all* the power solely in the hands of the Kansas Legislature; it purports to permit the exercise of that power only if a

19

supermajority supports it. That is the Article V problem. Article V permits no limit on state legislatures' power to ratify amendments or apply for conventions. *See Hawke*, 253 U.S. at 230; *Leser*, 258 U.S. at 137.

Next, Defendants contend that history and tradition are on their side. Doc. 38-1 at 13. In general, they argue that when "history and tradition [are] appropriately examined it is clear that the intent of Article V was not to limit how states choose to exercise this power." *Id.* According to Defendants, the colonies employed several methods for selecting delegates to conventions that predated the Constitution and, in turn, this does not "support the idea that Article V limits the states' method of application." *Id.* But there are reasons to doubt Defendants' gloss on the historical record. As the Eighth Circuit has noted, the framers disfavored the right of the people to instruct their legislators how to vote. *Miller*, 169 F.3d at 1124. In 1789, the House of Representatives rejected a proposed "right to instruct Representatives." *Id.* This occurred even though several colonies had such a right in their constitutions. *See* Akhil Reed Amar, *Philadelphia Revisited: Amending the Constitution Outside Article V*, 55 U. CHI. L. REV. 1043, 1059 (1988) (noting that North Carolina, Pennsylvania, Massachusetts, New Hampshire, and New York guaranteed the right to instruct legislators). The framers considered that the right to instruct legislators would tend to "swallow up [the] scheme of representative politics." Amar, *Philadelphia Revisited* at 1059. Thus, Article V expressly conferred power not to the population generally, but to the "Legislature." But even if the historical record favored Defendants, it would not matter because *Hawke* and *Leser* foreclose the issue. *See Schell v. Chief Justice & Justices of the Okla. Supreme Court*, 11 F.4th 1178, 1191 (10th Cir. 2021) (noting that courts are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings") (alterations and quotation marks omitted).

Defendants note that "[i]f *Hawke* is held to support federal control over state legislatures when they apply for a constitutional convention, then it may be time to overturn *Hawke*." Doc. 38-1 at 18 n.6. That contention fails for at least two reasons. One is because Article V of the Constitution is the source of the ratification and application power. That power does not derive from state law. *Hawke* merely recognized that this power conferred by Article V cannot be enhanced, restricted, or commandeered by anyone but state legislatures. The other is because this is the wrong forum for that argument. Under our system of vertical stare decisis, federal district courts have no power to overrule, second guess, or undermine the rules established by higher courts. *See*

*Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."); *United States v. Guillen*, 995 F.3d 1095, 1114 (10th Cir. 2021) (noting that "[v]ertical stare decisis is absolute"); *see also* Amy Coney Barrett, *Precedent and Jurisprudential Disagreement*, 91 TEX. L. REV. 1711, 1712 (2013) ("Vertical stare decisis is an inflexible rule that admits of no exception."); Evan H. Caminker, *Why Must Inferior Courts Obey Superior Court Precedents?*, 46 STAN. L. REV. 817, 818 (1994) ("[L]ongstanding doctrine dictates that a court is *always* bound to follow a precedent established by a court 'superior' to it.") (emphasis in original). Only the Supreme Court of the United States may overrule one of its decisions. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 137 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)) (noting that lower courts must leave to the Supreme Court "the prerogative of overruling its own decisions").

Finally, Defendants contend that *Hawke* is inapposite because application for a convention under Article V is a "legislative function." Doc. 38-1 at 16. They argue that while ratification is "a binary, up-or-down, consent-or-no choice," application is "more like an ordinary lawmaking function, where the legislature determines in the first instance the scope, language, and purpose of the resolution." Doc. 38-1 at 17. Thus, the argument goes, the Kansas Legislature can be limited by Section 13 because "state legislatures 'are bound by the provisions of the very documents that give them life.'" *Id.* at 18 (quoting *Moore v. Harper*, 600 U.S. 1, 27 (2023)).

This argument is unconvincing. As noted, the text of Article V fails to support treating the ratification clause differently from the application clause. Under *Hawke* and its progeny, the power extended by Article V cannot be restricted by state efforts. In fact, if state legislatures' power to ratify is not legislative, as *Hawke* held, then *a fortiori* their power to apply for conventions is not legislative either. In essence, legislation is a two-step process: writing the text of the law and assenting to it. Ratifying an amendment is one step removed. It consists only of assenting to the text of the law but not of writing that text. Applying for a convention is yet another step removed. There is no writing of any law or assenting to it. A vote to apply for a convention is simply a vote to convene. *See* Walcoff, 85 COLUM. L. REV. 1525, 1537–38 (1985) (explaining as much in detail). This analysis is fully consistent with the

structure of Article V. Defendants identify neither binding nor persuasive authority supporting the position that state legislatures' application power is a legislative function.

And *Moore v. Harper*, cited only in passing, is inapposite. *Contra* Doc. 38-1 at 18. That case concerned the power of state legislatures to draw congressional districts under the Elections Clause. The Court held that the Elections Clause "does not insulate state legislatures from the ordinary exercise of state judicial review." *Moore*, 600 U.S. at 22. In dicta, the Court noted that "*when legislatures make laws*, they are bound by the provisions of the very documents that give them life." *Id.* at 27 (emphasis added). As noted above, there is no reason to conclude, and Defendants have made no compelling argument suggesting, that state legislatures are making laws when they apply for a constitutional convention. Instead, the cases and commentators conclude just the opposite.

### III

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Pleadings, Doc. 33, is GRANTED, Defendants' Motion for Judgment on the Pleadings, Doc. 35, is DENIED, and the proposed intervenor defendants' objection, Doc. 29, is OVERRULED.

It is so ordered.

Date: November 5, 2025          _s/ Toby Crouse_____
                                Toby Crouse
                                United States District Judge